1, 2, 3, 5, 3, Zhejiang Native Produce v. United States. I think we're good to go. Did I mispronounce the name of your client? Close enough, Your Honor. Good morning. Jordan Kahn with Grunfeld Desiderio representing the appellant Zhejiang Native. Commerce in the first administrative review of the anti-dumping duty order on honey from China made internally inconsistent results-oriented decisions that were unsupported by substantial evidence. Before you get into that, can I just ask you a logistical neutral question, which is we're talking about something that happened in 2001. Why are we here in 2018 dealing with this? Is this a continuous issue that even though it was dated 2000-2001 continues, or is this the one-off that we're just here 17 years later dealing with? We happen to be here 17 years later, Your Honor. The honey has long been consumed. However, the duties have not yet been paid because it's our position that the duties were artificially inflated. So what's happened in the 17 years in the interim? Have there been further disagreements or disputes? Have you not been in court in this, or what's been going on for 17 years? Well, the main thing that's happened, Your Honor, is litigation in front of this court considering the applicable time period. Now, the first period of review, which is subject of litigation here, is unusual as compared to the subsequent reviews that are always a year. The first review size can be much larger or smaller than a year depending on certain circumstances. So is what we decide here with respect to this discrete 17-year-old process of review have impact on other stuff that's happened in the interim, or is this just a discrete issue? Well, there are some continuing themes here, but we're here because we don't want to have to pay the anti-dumping duties that were assessed on these entries that came in between 01 and 02. We think that they were unreasonably calculated in a number of respects. But some of the reasons for that is that you said that it was inappropriate to rely on the 2000 article instead of the 2001 article. But didn't we decide in Wuhan-B, or didn't the court decide in Wuhan-B that, in fact, that use of the 2000 article was reasonable? Well, that was the court below, and we have a de novo standard here. We respectfully disagree with Wuhan. We believe that there was plenty of reasons to pick the 2001 article over the 2000. First of all, it's undisputed which is more contemporaneous, which is a critical commerce criterion for selecting surrogate values. So what's our standard of review with respect to the question of what constitutes the best available information? It's substantial evidence. Not de novo. Not de novo, that's right. It's whether or not commerce is decision. Here, the critical finding, why commerce used the older article that was not only less contemporaneous, but it was less representative, because the 2000 article used honey prices from a single Indian city, whereas the 2001 used honey prices from the largest Indian state. I know, but there were drawbacks. I mean, this is really a very fact-based determination. And you're right, you were closer in time, but there were deficiencies identified in the study that you were promoting. So under a substantial evidence review, how do we get to where you want us to go? We just do not see how commerce or the court could conclude that the later article was unreliable. But they made specific findings of fact. They said that it appeared to identify imports from four countries as suppressing Indian honey prices, but the Indian government import statistics did not show honey imports from those countries during the relevant period. I would draw your Honor's attention. Are you saying that was clearly erroneous? Yes, that was clearly erroneous, because if you look at the wording of the 01 article on APPX63, they're talking about imports coming in at prices between 20 and 25 rupees, period. It has affected beekeepers in a big way, period. The production cost of honey in India is near 23 rupees per kilogram, and procurement price is only 24 rupees. There's no doubt that that 24 rupees is India-wide. So yes, it may have been impacted by the import prices coming in on the lower end of that range. But from our perspective, it is crystal clear that that 24 rupees price was for India. But wasn't commerce saying that this whole part of this article is not as reliable, because it's saying that there's imports when, in fact, the data shows that there was no imports? So they're questioning the whole veracity of this entire section of the article. Isn't that correct? That's how I understand commerce is saying. You're saying that we as an appellate court should disregard that finding of fact because you can separate out the thing that was untrue from the thing that you contend here is true? Well, for two reasons. The first is, yes, Your Honor, the fact that it's clear to us, and we think any reasonable mind, that the procurement price of rupees 24 is an Indian-wide value. It has nothing to do with the other import prices, whether or not those imports could be substantiated. But this is what sets this case apart, is the amended record that we obtained through FOIA. This is an extraordinary occurrence where commerce supplemented the record, and it included interviews that they had with the author of this publication. And they said that those interviews showed that the author's responses had many internal inconsistencies. See, here's where there's just no reasonable mind could find it. This is what the author told commerce. The raw honey price of 24 rupees was from a raw honey market in Punjab. It had nothing to do with imports. And in fact, if commerce was concerned about that price, they could and should have asked the author when they spoke directly to him. So you're saying that commerce should have said, all right, well, let me figure out which statements in this article might be right, even though it's clear that some of them are not, rather than just say this article does not give us the best available information, because there are definitely some things that are wrong. If commerce is going to take the time and effort to go behind the surrogate data, which they seldom do, and interview the author, it's on them to clarify any concerns that they might have. Here they did the opposite. What they did was they didn't tell us. Had they put this on the record, we could have commented on it. We could have rebutted it. They concealed it until we went through the FOIA process, at which point they reach in to the article and they say, well, the author said international competition, so therefore it's all the more unreliable. We find that no rational fact finder could make that. What we see here is an administrative bias to stay the course. That term is actually in the administrative record, and give Zhejiang an artificially high administrative anti- But the CIT did a remand in order to allow further development of this record, right? This was a voluntary So you had an opportunity to make all of these arguments, right? We did make those arguments. We feel that the CIT erred by, in essence, rubber stamping this decision and not giving this amended record the credence that it deserved. It is compelling evidence that shows that commerce disregarded its own memorialized record keeping. There's something called the presumption of regularity, which in this case means that when commerce interviewed the author and wrote down the 24 rupees price as Indian, that's presumed to be valid unless somebody shows contrary evidence. That information was concealed, and when it's put on the record, we're faulted with not having done enough. From our perspective, this is a heads we win, tails you lose approach, and it contradicts the presumption of regularity. Similarly, turning from the raw honey price to the inflator, where we contend commerce added insult to injury by taking that raw honey value and improperly inflating it using a convoluted tripartite methodology. There was handwritten prices from two small bee farms that were used to inflate the price well above the WPI for six months. Now, it's important to note that commerce had rejected these prices as a surrogate value, finding that these handwritten bee farm prices were not public and they were too limited, but yet commerce turns around and uses these bee farm prices to inflate the raw honey surrogate value well above those rejected prices. At a minimum, commerce should have capped its inflator for the end of the period using information from USDA. The FOIA record revealed a USDA official in India getting prices from Indian beekeepers, but commerce unreasonably discredited that information. They said, oh, it's not public, it's not substantiated, but there's no basis to question the USDA information. Basically, commerce said you've got two different articles, neither of which is perfect. One represents data from the largest honey producer, the other either the second or the third, and then the 2001 article, they said, had a number of flaws, and they said choosing between two imperfect choices, we think that the 2000 is more representative, and because it was publicly available, that makes it more reliable. Well, both articles were equally publicly available. It was the same tribune of India. So that factor is an equipoise. Contemporaneous criterion goes our way, clearly. So the specificity factor is an equipoise. The representativeness factor goes our way. It's all about this reliability finding. Where commerce erred was saying from a binary perspective, they're both not contemporaneous, they're both not countrywide. What they didn't do was measure the gradients, where ours was much more contemporaneous and much more representative, and we also feel that that unreliability finding was erroneous. And just to talk a minute more about this amended record, because, again, we have a pattern. They did it with the raw honey prices. Now with the inflator, the information comes to light that's kept by government officials, in the case of the inflator, a USDA official in India, and commerce is saying, well, no, we're not going to use that information. You haven't proved its validity to us. Well, wait a second, you're going to conceal information, and then after we get it on the record, even though it's beneficial to us, you're going to fault us for not having proven its validity? We're asking for the inflator, that this USDA information be used as the same limited purpose as the bee farm data for the inflator. So we feel that our position is that for both honey and the inflator, commerce is disavowing its own information and that from a sister agency in its haste to maximize the dumping margin. And finally, if I may turn to financial ratios, this is the third issue. Commerce unreasonably declined to average consecutive financial statements, choosing the earlier only because it covered more than ten months of the period, while the newer one covered just eight. Such rigid adherence to the contemporaneity criterion cannot be reconciled with commerce's flexible approach for raw honey, and it ignores, this is very important, it ignores the dramatic shift in profits for that one company between fiscal years. Profits dipped nearly 30% between the fiscal periods. So averaging these two financial statements would capture the most complete financial experience of the surrogate industry. And that's a quote when commerce did it back in 2005. Again, the averaging of these financial statements would also have included the months when the bee farm prices peaked. This is a time period that commerce found critical for the inflator but ignores altogether for the ratios. So again, the first administrative review is oversized. Here it's more than 18 months. So that's all the more reason why commerce can and should average financial statements when calculating ratios. But commerce explained that it's not their practice and that when assessing non-market economies that their methodology is to pick the most contemporaneous data, right? It may be when there's not compelling evidence. But here, because of the bee farm prices, because of the profits, there is compelling evidence to use to average statements. And in fact, they do average statements on occasion. They did during the pendency of the appeal. We filed a supplemental authority in March when commerce finalized such averaging. Why don't we reserve the remainder of your time on the other side. Thank you. Your Honor, I'm actually joined by the defendant intervener and I would like to reserve three minutes for him if it's possible. Yes, so we'll run your clock at 12. Can we start it at 12? And then it's up to you to abide by the clock. Good morning. May it please the court. To start with, one of the first questions was what happened with this case and why it's so old. And the simple answer is that this case was stayed in the trial court from 2006 through 2014 while this court was actually taking on another case. And so that's why this is so old, just because it was stayed in the trial court. And then once there was a decision from this court about a finding of no critical circumstances, then that's when it came back to the trial court and the period of review was shortened. And so commerce did ask for a voluntary remand to consider the additional documents in the record. And so just to explain, it was stayed for a period of years. So commerce asked for the remand so there was no hiding of this additional evidence? That's correct. Commerce did ask for a voluntary remand to consider those additional FOIA documents that commerce had placed on the record. And then in addition, I would clarify that those FOIA documents or the amended documents in the record, which can be found starting at pages 512 of the appendix, those were actually related to a different administrative proceeding and were notes taken in an entirely different administrative proceeding. And again, as this court probably is familiar with, each administrative review is separate when it comes to each period of time. So the notes from the interview were from a different proceeding? It was from a different period of time, yes. And then again, that was going on 15 years ago as to when those notes, as to when the analyst spoke with both authors of both the 2000 and 2001 articles. And so as opposed to hiding any documents, commerce did place the documents on the record, did ask for voluntary remand, and did consider those documents when it undertook that remand proceeding. Do you agree with your friend on the other side that in that interview that the author said there was no impact from any other countries or international prices and that it was all based on Punjab data? I disagree. And commerce explained why, again, that 2001 article was still inconsistent despite talking with the author. And I would note that what seems to be missed here is that 15-plus years ago when these analysts spoke with the authors, the point of that was to figure out the source of the honey in both articles. And commerce, in fact, determined that, again, both the 2000 and 2001 articles referred to regional sources of honey as opposed to countrywide after examining these new documents. And to go to your question, Your Honor, Was the purpose at all to confirm the information that the author provided? To confirm the source of the honey. Not confirm the information was accurate? It's my understanding not to confirm specific details of any particular article tied back to each article. But why I would say is that although it says 24 rupees per kilogram, and this is at page 524 of the record, what the author also said was that the price of honey is highly elastic depending upon supply, which is affected by factors such as the weather and international competition. And moreover, if you turn to page 525, the analyst also noted that when he spoke to the author, the author had said that he believed that 30% of the entire honey production was in Punjab. But, I'll quote here, that is mathematically confusing because Dhalawal also mentioned that he obtained information from honey farmers who, according to their rough estimates, believe that the total honey production is more than 8,000 tons. And so, again, despite looking at the amended record, Commerce still determined that the 2001 article was internally inconsistent as to what the exact price of raw honey produced in India is. And so, therefore, determined that the 2000 article was the best available source of information to value raw honey. Can you explain the inflation methodology? It's a little confusing. It is a little confusing. And so, with the inflation methodology, and Commerce explained that at pages 691 and 92 of the record, but what Commerce first had was the period of review upon remand was roughly May 2001 through November 2002. And so, what Commerce first did was, and all of my friends said that the 2001 article is more contemporaneous. In fact, they're both not contemporaneous because they both are outside the period of review. So, regardless, an inflator would have had to be applied to that 2001 article as well. But so, just to break it down, there were three different periods that Commerce looked at with this inflation methodology. And during that first period of time, up to December 2001, Commerce used the price that was quoted in the 2001 article and just inflated it according to the Indian Wholesale Price Index. But then we get into the issue of the bee farms, because from December 2001 through May 2002, the raw honey prices, it was almost like hyperinflation, the raw honey prices increased in excess of the Wholesale Price Index. And so Commerce looked at those prices from the Indian bee farms to basically apply an extra hyperinflation on top of the Indian Wholesale Price Index. Then we get to the third period, which is June through November 2002, where Commerce found that the price of honey was in line again with regular inflation, and so just applied inflation on top of the price quote of honey. And then when you had all three periods, basically took all three and divided by three and came up with one number. And so it does seem somewhat complicated, but when it comes to at least the bee farms, Commerce used the bee farm data to account for the fact that there was that period of hyperinflation. With the price of raw honey. And again, I would note that what is not challenged by Zhejiang is that actual inflation methodology. What, again, was mentioned was that the Singh email, or the conversation with the USDA individual in India, that they should have used it capped that inflator. But Commerce explained why it didn't do that, because as it said, and this is at page 692 of the record, and that email can be found at 533, was that the prices he gave Commerce, they'd asked for him to substantiate and corroborate those prices, and he wasn't able to do that. And so Commerce decided that, again, when it comes to determining surrogate value, it's looking for the best available source of information. And so used those bee farm price quotes for the very limited purpose of just the inflation methodology. If there are no further questions, we respectfully request. What about the averaging issue? Oh, when it comes to the. Why doesn't Commerce average when we're talking about data that has at least overlapping periods? Well, Commerce, and again, this is substantial evidence. Commerce explained that in this instance, it determined that the best available source of information was the 2001 through 2002 financial statements rather than because that covered 10 months of the period of review versus the other covered eight. And it also explains, and this is a page of 702 of the record, that averaging, and I'll just quote here, that Commerce's practice is not to average financial statements for the same company when calculating surrogate values for financial ratios, because that actually results in a less accurate representation of the data. And so Commerce explains why it chose not to average the financial statements. And then again, in addition, although it was mentioned that there was a dramatic shift in profit with that later financial statement, Commerce said, again, it's 702 of the record, that it would improperly weight the surrogate financial ratios according to a single input. And that's raw honey, and not the surrogate country's experience as a whole. Because the point is not just to look at honey with these financial statements. You're using this to find the selling, general, and administrative expenses, so the overhead. And that's why Commerce determined, again, that based on the record before it, that the best available source of information was the 2001 financial statement. Thank you. Good morning. Michael Corsi for the dependent intervenors below. Sioux Honey Cooperative and the American Honey Producers Association. I don't have much to add to what my friend said here. I did want to point out that the CIT, Judge Eaton below, examined each of the questions you've been asked here in great detail and provides a very good index of answers to all of these questions and explanations. One question that you had is standard of review. The standard of review is the same here as it was before the Court of International Trade. Is it based on law, and is it based on substantial evidence? However, there are qualifiers to that which this court has recognized often. One is that when it comes to surrogate values, Commerce has given broad discretion to choose among various surrogate values. Just on the surrogate value for honey, I would mention there are four factors to keep in mind. Is it publicly available? Is the data publicly available? Is it product-specific? And here, raw honey, both sides. Yes to both those questions or both articles. Broad market average? No to both articles. Broad market average means India-wide. Here, Commerce found 101 was Madras-wide, very big region. I'm sorry, the March 2000 article. And the March 2001 was broad with Punjab, another big country. But neither one of them were country-wide. Contemporaneous, as my friend said. Neither was the March 2001 article. It was less non-contemporaneous, but neither one was in the article. The real question here is the fifth factor, reliability. And I can't avoid the word, but reliability trumps really everything else. You're exactly right on the analysis that Commerce looked at, especially in the documents that were added after the original final results from the Wuhan review. Commerce went back to find out what exactly did go on there. And what they found is that the 01 article was unreliable for two reasons. One, it said the domestic market price was being affected by imports from four countries. Commerce found, originally, and found after looking at these additional records and calling, after calling into India, calling to the writers, that this still could not be explained because Indian import stats showed there were no imports from these countries. The second point is important. The discussion with the author of the March 01 article had that author saying, believe me, this is data. These are prices from the Punjab market. And in fact, there was nothing to back that up. In other words, what Commerce looks for in these things is reliability. Who did you talk to? Where exactly was this? What did they cover? That sort of thing. Commerce found it just was unreliable, and given all the problems there, it went with the March 03. On the issue of the inflator, it's important to keep in mind what's not at issue here. Commerce's practice is basically surrogate value prices before the period of review. You typically apply the wholesale price index for the country as a whole to that price over the period to get the regular inflation. The friend for Xi Jinping doesn't challenge that. The second thing is that if the record shows that there is a difference for the commodity at issue, Commerce will use that data and apply a commodity-specific inflator for the period. Again, Xi Jinping doesn't object to that or challenge that. What it objects to is the fact that prices for this six-month period right in the middle from this beef farm were used when those same prices were rejected by Commerce for the surrogate value for honey. Commerce had a reason for doing that. The point is that this is an apples and oranges discussion. Separate criteria for surrogate value, separate criteria for the range or for the commodity-specific inflator. Finally, on the last point, I just want to remind the Court that we didn't argue the administrative, the party failed to raise the issue below. The government did. What we did as interviewers is we went in and looked at the question of whether it was Commerce's practice to not stack reports from the same company on top of each other. And you should look at that. Commerce's theory there is that what happens is you get something that's too long. It doesn't fit the period. It may fit the next period that goes. But you can bring data that is outside the period in a manner that hurts their analysis. Thank you. Just a few rebuttal points, Your Honors. First, about this amended record. The Department told the CIT that these documents were inadvertently omitted. This is APPX 512. It's strange credulity to accept that this was just an oversight. We would never have seen these documents if we didn't move through FOIA. And it's important to note that Commerce is only asking questions that helped bolster their decision-making. If they had concerns about the reliability of the raw honey value, which we don't see it from reading the record, but if they did, it was incumbent upon them to ask the authors when it spoke directly to them. Next, on the inflator methodology. I agree, Your Honor, it is entirely convoluted, but that's only because Commerce makes it so. Our primary argument is just a straight WPI across the board. We have a capping argument that's sort of a backup argument, but the main one is just apply the WPI. As counsel for petitioners just said, Commerce does, in certain instances, use a commodity-specific inflator. But here, the record does not support doing that. Are you saying that Commerce's position that there was an unusual period of time and that there was actually hyperinflation, that that's just not true? It's unsupported because in the instances that they keep citing, this garlic case, the government of India had a garlic-specific inflator that they used here. These are handwritten prices from two small beef farms that Commerce has discredited and said these are not usable for surrogates. Yet they turn around and use it to increase the raw honey value beyond had those surrogates been used. So, yes, Your Honor, we disagree that it was proper to use those handwritten notes as a basis for hyperinflation. My last rebuttal point is talking about the record as a whole, that the government and the petitioner, as did the court below,  But I urge you to look at it as the record as a whole, and you'll see these internally inconsistent agency actions. The contemporaneity criterion is flexible for honey but rigid for financials. The beef farm prices are critical for the inflator but ignored for financials. The SV criteria are employed selectively to inflate using prices from the beef farms but not from the USDA. The unifying theme here is agency action to maximize our dumping margin. What is the value of the duty that's at issue that hasn't been paid? Well, the duty rate is 67%, but the value is proprietary. I'm unable to share that in a public setting. Thank you. You're welcome, Your Honor. Thank you. Both sides and the case is submitted.